**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LANISE HENRY,** | : | Case No. 1:05cv1598 |
| Plaintiff, | : | JUDGE KATHLEEN O'MALLEY |
| v. | : | |
| | : | <u>ORDER</u> |
| **MURTIS H. TAYLOR** | : | |
| **MULTI-SERVICE CENTER,** *et al.*, | : | |
| Defendants. | : | |

This case involves claims asserted under Section 301 of the Labor Management Relations Act, 29 U.S.C. §185, in addition to claims of employment discrimination asserted under various federal civil rights acts. The Court has jurisdiction under 28 U.S.C. §1331.

Plaintiff Lanise Henry ("Plaintiff") alleges that her former employer, Murtis H. Taylor Multi-Service Center ("Murtis"), discriminated against her based upon her race and religious beliefs, and that Murtis breached a collective bargaining agreement with Service Employees International Union District 1199 ("the Union") by discharging Plaintiff without just cause. As to the Union, Plaintiff alleges it breached the collective bargaining agreement with Murtis by failing to fairly represent Plaintiff in her dispute with Murtis.

As a result of a prior Order issued by the Court, Count II of Plaintiff's Complaint, which contained the claims of employment discrimination asserted against Murtis, was dismissed in response to an unopposed Motion to Dismiss filed by that defendant. The only Count remaining in Plaintiff's

Complaint, therefore, is Count I - consisting solely of claims asserted under Section 301 of the Labor Management Relations Act.

Before the Court is a Motion for Summary Judgment filed by the Union with respect to the surviving claims in the Complaint. The Union argues it is entitled to summary judgment on Plaintiff's claims that the Union breached the collective bargaining agreement because Plaintiff has not come forward with any material evidence to indicate that the Union discriminated against Plaintiff, acted arbitrarily or in bad faith towards Plaintiff, or otherwise failed to satisfy its duty of fair representation in its dealings with Plaintiff.

For the reasons set forth below, the Union's Motion for Summary Judgment (Doc. 22-1) is **GRANTED**.

**I.     BACKGROUND**

The following facts are undisputed. Plaintiff is an African-American female who began her employment with Murtis on February 16, 2004. Murtis is a service agency that assists clients in making the transition from a mental hospital back into society. Robb Reinker ("Reinker") has been the director of Human Resources for Murtis since 2003. Many of Murtis' clients are residents at its transitional facility, and suffer from various addictions - including drug and alcohol addiction. *Reinker dep.*, p. 11. It is not unusual for Murtis residents to become hostile and make threats against Murtis employees as a result of their mental state. *Reinker dep.*, pp. 12-13.

The Union represents service sector employees, such as hospital workers, nursing home workers, and workers in mental health facilities - including those working for Murtis. During the relevant time period, Murtis and the Union were parties to a collective bargaining agreement that covered Plaintiff's employment. Monica Moran ("Moran") is an Administrative Organizer for the Union, and was assigned

to service the Murtis facility. *Moran dep.*, p. 6.

Plaintiff was initially hired by Murtis to fill the position of Team Support Assistant Floater. In that position, Plaintiff acted as a "backup" for the receptionist and also assisted other team members in various locations by contacting their clients to ensure they kept their appointments. Plaintiff was on a ninety-day probation during this time. *Plaintiff's dep.*, p. 24. After her probation period ended, in or around May 2004, Plaintiff became a Residential Worker in the "therapeutic community." In that position, she was responsible for teaching independent living skills to residents, group discussions, and medication monitoring. *Plaintiff's dep.*, pp. 24-25.

During her employment with Murtis, Plaintiff did not have a positive relationship with most of her colleagues. She enjoyed working with only three of her co-workers, and filed grievances against several others. *Plaintiff's dep.*, pp. 50-51, 55, 59. Many of those grievances contained complaints by Plaintiff that she was being harassed by her co-workers. *Reinker dep.*, p. 12. Whatever the source of the friction, there was an apparent inability between Plaintiff and several of her co-workers to peacefully co-exist.

In early September, 2004, Plaintiff was charged with insubordination following an altercation between Plaintiff and a resident. Plaintiff was instructed by her supervisor not to call the police, but did so anyway. *Plaintiff's dep.*, pp. 54-55. Another instance of insubordination was documented after Plaintiff disregarded the instructions of her supervisor and withheld medication from a resident. *Plaintiff's dep.*, p. 70. Plaintiff conceded in her deposition that she disobeyed a direct order regarding medication monitoring, and that such disobedience is grounds for immediate termination. *Plaintiff's dep.*, pp. 72-73.

Plaintiff also had a less-than-amicable relationship with some of the residents at the Murtis

3

facility. On at least the one previously mentioned occasion in September, 2004, Plaintiff called the police on a resident despite direct orders not to do so. *Plaintiff's dep.*, pp. 54-55, 102. Subsequently, on December 13, 2004, Plaintiff went to the police station and attempted to file charges against another resident with whom she was having problems. *Plaintiff's dep.*, p. 97. After being informed that "the prosecutor would not accept a charge against a resident taking psychotropic medications," Plaintiff called Murtis to inform them that she would not be coming in to work. *Plaintiff's dep.*, p. 98. Plaintiff, however, changed her mind and reported for work later that day. *Id.* She then engaged in discussions with the human resources department regarding the same resident. Apparently not satisfied with the outcome of those discussions, Plaintiff handed in a letter of resignation and left the worksite that same day. *Plaintiff's dep.*, pp. 99-102. The letter advised Murtis that Plaintiff was not returning to work until Murtis provided a harassment-free, safe workplace. *Reinker dep.*, p. 21.

Plaintiff believed she had terminated her employment with Murtis on December 13, 2004, and admits she had no intention of returning to Murtis. *Plaintiff's dep.*, p. 101-02, 179. She was also aware that, by submitting her resignation, she forfeited all employment rights and benefits afforded to union employees under the collective bargaining agreement. *Plaintiff's dep.*, pp. 179, 181. Nevertheless, after speaking with Robb Reinker and being informed that Murtis would consider Plaintiff's actions a resignation unless she came in for a meeting to resolve the matter, Plaintiff decided to return to the jobsite the next day. *Plaintiff's dep.*, p. 192. At that time, Reinker did not feel he had enough information to make a termination decision and, thus, gave Plaintiff the benefit of the doubt and the option of returning to work for the meeting. *Reinker dep.*, p. 23.

Upon her return to the workplace, another incident immediately occurred with a resident. *Plaintiff's dep.*, p.192-93. In response to various problems she had been having with a particular

4

resident, Plaintiff intentionally "pretended" to be recording the resident's telephone conversation on her cell phone to see what type of reaction she would get. *Plaintiff's dep.*, pp. 64-65, 83-84, 86-87. The reaction of Murtis was that, during the previously requested meeting, held the <u>same</u> day as the new resident incident, Plaintiff was informed she would be placed on a 5-day investigatory suspension without pay. *Plaintiff's dep.*, p. 196.

After Murtis representatives calculated a return-to-work date for Plaintiff, she mentioned to the representatives that her return-to-work date was actually her day off. *Plaintiff's dep.*, p. 197. Plaintiff was told she would have to come in that day, and that she would be granted a follow-up meeting on December 23, 2004. Plaintiff, however, said "no" to the meeting and told Murtis to "take care of all of it right here today." *Plaintiff's dep.*, p. 197; *Reinker dep.*, p. 31. After further discussion, Plaintiff rejected the suspension, advised Murtis that she was not going to come to any further meetings, and told Murtis to "do whatever they were going to do" - including discharge. *Plaintiff's dep.*, p. 199; *Reinker dep.*, pp. 31, 40.

Plaintiff was terminated after a unanimous decision was reached by Reinker, the chief mental health officers, the head of quality control, and several clients' rights officers. *Reinker dep.*, p. 30. The reasons given by Murtis, as documented in Plaintiff's personnel file, were an inability to deal with the mental health population, poor judgment, violation of HIPAA regulations, and violation of various personnel policies - including walking off the job. *Reinker dep.*, pp. 11-12, 28.

Plaintiff subsequently filed a grievance with the Union to challenge her termination. In or around early February, 2005, Plaintiff was granted a Union meeting with Murtis to discuss her termination. *Plaintiff's dep.*, p. 204. At least two Union representatives were present to defend Plaintiff at the meeting. *Plaintiff's dep.*, p. 208. On February 19, 2005, Plaintiff received a certified letter from

5

the Union advising Plaintiff that Murtis was standing firm in their position not to rehire her. *Plaintiff's dep.*, p. 210-11. The letter further stated that if a decision was made not to arbitrate the grievance, Plaintiff would be instructed with respect to an appeal. *Id.* Plaintiff admits that as of February 19, 2005, she was aware arbitration was not guaranteed and that her case may or may not proceed further. *Plaintiff's dep.*, p. 211-12.

Plaintiff subsequently received another letter from the Union informing her that her grievance was being sent to Columbus for additional Union review. *Plaintiff's dep.*, p. 213. Following this review, it was communicated to Plaintiff that the Union was recommending against arbitration. *Plaintiff's dep.*, p. 212.[1] Plaintiff was also advised she had the right to appeal the Union's recommendation to the Executive Board Appeals Committee. *Plaintiff's dep.*, p. 214-15. Plaintiff filed a letter of appeal, was granted a hearing date, and appeared before the Appeals Committee in Columbus in or around April, 2005. *Plaintiff's dep.*, p. 215-17.

According to an Exhibit attached to the Union's Motion, a standard Appeals Committee hearing proceeds as follows:

| | | |
|---|---|---|
| Chair | 5 Minutes | Introduction |
| Grievant | 10 Minutes | Give reason(s) why case should be arbitrated |
| Organizer | 10 Minutes | Rationale for decision not to arbitrate the case |
| Grievant | 5 Minutes | Rebuttal to Organizer's rationale |
| Organizer | 5 Minutes | Rebuttal to Grievant's rationale |
| Appeal Committee | 10 Minutes | Question & Answer Session to both |

---

[1] The Union, however, temporarily moved Plaintiff's grievance to arbitration to preserve time limits since, under the collective bargaining agreement, a grievance - regardless of whether or not arbitration is ultimately granted - must be moved to arbitration within twenty days of a Step 2 response (*i.e.*, a meeting with the employer). *Moran dep.*, pp. 8-9.

The Committee is made up of Union members (in contrast to the paid Union team staff that initially reviews the grievance), and has previously overturned team decisions not to arbitrate. *Moran dep.*, p. 17.

At her hearing, Plaintiff was granted as much time as she needed to present her case. *Plaintiff's dep.*, p. 218-19. Plaintiff concedes that she took advantage of the additional time. She had previously consulted with counsel, and had counsel's assistance in preparing her remarks. *Plaintiff's dep.*, p. 219. Each side was granted an opportunity to rebut the evidence put forth by the other party, and Plaintiff had no reason to believe that any member of the Appeals Committee had any hostility towards her. *Plaintiff's dep.*, p. 219.

Sometime after the hearing was held, Plaintiff was informed that the Appeals Committee had rejected Plaintiff's appeal, and that it was upholding the Union's determination not to arbitrate Plaintiff's grievance.[2] It is this decision that led to the filing of Plaintiff's Complaint in this Court.

## II. STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as matter of law." In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970);

---

[2] A charge Plaintiff later filed against the Union with the National Labor Relations Board was also dismissed. *Plaintiff's dep.*, p. 204.

7

*White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252. Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989)(citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

**III. DISCUSSION**

The issue presently before the Court is whether there are any genuine issues of material fact presented by the record that require a trial for resolution. Upon reviewing the evidence in a light most favorable to Plaintiff, the Court concludes there are not.

### 1. Breach of the Collective Bargaining Agreement

In Count I of her Complaint, the only cause of action remaining in this case, Plaintiff claims that her former employer - Murtis - breached the collective bargaining agreement by terminating her employment, and that the Union breached a duty of fair representation (likewise breaching the collective bargaining agreement) when it failed to "fairly represent" Plaintiff in her dispute with Murtis.

The type of claims asserted by Plaintiff in Count I of her Complaint are generally referred to as a "hybrid Section 301 claim." *Martin v. Lake County Sewer Co.*, 269 F.3d 673, 677 (6th Cir. 2001)(citing *DelCostello v. International Board of Teamsters* (1983), 462 U.S. 151, 164-65). A hybrid Section 301 suit implicates the interrelationship between a Union member, his or her Union, and the employer. Based on this interrelationship, it has been held that claims asserted under Section 301 against a Union and an employer rise and fall together - failure to prove a breach as to one defendant is a failure as to both defendants. *White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 559-60 (6th Cir. 1990). Because of this, Plaintiff must prove **both**: (1) that Murtis breached the collective bargaining agreement; and, (2) that the Union breached its duty of fair representation. If either prong is not satisfied, Plaintiff cannot succeed against any of the defendants. *Garrish v. Int'l Union*, 417 F.3d 590, 594 (6th Cir. 2005).

The summary judgment motion currently before the Court focuses solely on the Union's duty of fair representation in the grievance context. The duty of fair representation "is a federal obligation which has been judicially fashioned from national labor statutes." *Abrams v. Carrier Corp.*, 434 F.2d 1234, 1251 (2nd Cir. 1970). In order to sue a Union for a breach of the duty of fair representation, a plaintiff must show more than simple dissatisfaction with the Union representation; she must show that the Union's actions or representation was "arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386

9

U.S. 171, 190-91 (1967). Moreover, "[a] wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion." *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953).

It has become widely accepted that a Union's actions are arbitrary only if, in light of the circumstances, the Union's behavior is "so far outside a wide range of reasonableness, as to be irrational." *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 67 (1991). Where a Union has conducted a minimal investigation and follows its customary policies and procedures in handling the grievance, the Union will be found to have fulfilled its duty of fair representation. *Armstrong v. Chrysler Corp.*, 972 F. Supp. 1085, 1090 (E.D. Mich. 1997).

In this case, the Union argues it believed Plaintiff's grievance was unsuitable for arbitration because, among other things:

1. Plaintiff was a short-term employee (having only been employed by Murtis for approximately ten months);

2. There was a history of job performance issues, commencing shortly after the end of Plaintiff's probationary period;[3] and,

3. Plaintiff resorted to "self help" by walking off the job without any notice.

An analysis of these factors caused the Union to determine Plaintiff's grievance could not succeed on the merits. This, in turn, led to the Union's recommendation not to arbitrate. According to the terms of the Union's collective bargaining agreement with Murtis, arbitration is discretionary. *Moran dep.*,

---

[3]  According to the unrebutted deposition testimony of Robb Reinker, there were approximately three to four written disciplines in Plaintiff's personnel file during September of 2004. *Reinker dep.*, p. 33-34.

p. 25. The Union disputes that its recommendation, therefore, was arbitrary or irrational.

In her four-page Brief in Opposition, Plaintiff does not argue - or offer any evidence - in rebuttal of the Union's initial determination that her grievance could not be sustained on the merits and should not be arbitrated. She does not even argue that this determination was made arbitrarily or in bad faith. Rather, Plaintiff contends the Union breached its duty of fair representation by "taking a position against her" when it recommended to the Appeals Committee at the April 21, 2005 hearing that arbitration should not be pursued.

Plaintiff believes the Union had a duty to "assume a neutral position" at the hearing, and allow the Committee to hear (and decide) the case strictly upon Plaintiff's proof. Plaintiff, therefore, argues that the Union's conduct in <u>not</u> taking a neutral position but, rather, opposing arbitration, was discriminatory, arbitrary, and undertaken in bad faith.

The Union responds to Plaintiff's short opposition by pointing out that among all the steps in the Union's multi-step grievance process, Plaintiff takes issue with a *single* circumstance - that being the Union's act of defending its prior recommendation. The Union claims that defending a prior recommendation not to arbitrate is in complete conformity with the Union's Appeals Committee process, and that the Appeals Committee cannot evaluate the propriety of a recommendation if it does not receive a presentation of the basis for that recommendation.[4]

### 2. Failure to Arbitrate/Breach of the Duty of Fair Representation

A Union member does not have an absolute right to have his or her grievance taken to arbitration. *Vaca*, 386 U.S. at 191. A Union's decision not to arbitrate, therefore, is not *per se*

---

[4] Plaintiff has not brought forth any evidence indicating that the Union's defense of a prior recommendation is in any way atypical.

11

discriminatory or arbitrary.  In order for Plaintiff to show that the Union's action in defending its prior recommendation was discriminatory, Plaintiff must come forward with "substantial evidence of intentional, severe" treatment that was different than the treatment afforded to others similarly situated in the grievance process.  *See generally, Motor Coach Employees v. Lockridge*, 403 U.S. 274, 301 (1971).  In the context of delay in handling a grievance, where the plaintiff alleged the delay was intentional, it was held:

> The length of time the union took to process plaintiff's grievance is not per se unreasonable.  Plaintiff has submitted no proof that the union typically processes other grievances faster than his, or that the union acted with bad faith. * * * Therefore, the union did not arbitrarily, unreasonably, or irrationally delay in the processing of plaintiff's grievance.

*Armstrong*, 972 F. Supp. at 1090.  The same rationale applies here.

Plaintiff has not submitted **any** evidence that her appeal was handled differently than other appeals of a recommendation not to arbitrate.  She merely makes broad, general statements in her Brief in opposition that the Union's opposition to her request to arbitrate was discriminatory and arbitrary. But, as in any discrimination context:

> Conclusory allegations of discrimination are insufficient if an action against the union for breach of its duty of fair representation is to be maintained. Rather, an affirmative showing by plaintiff that the union's action or inaction was motivated by bad faith is required.

*Whitten v. Anchor Motor Freight, Inc.*, 521 F.2d 1335, 1341 (6th Cir. 1975).

Here, the Union has come forward with evidence - including Plaintiff's own deposition testimony - that Plaintiff was actually treated ***more favorably*** than others by being permitted additional time to present her grievance to the Appeals Committee.  The Union's evidence further indicates that a second grievance under consideration the same day as Plaintiff's in the Step 2 process (*i.e.*, the

12

meeting with Murtis) resulted in termination. *Moran dep.*, p. 12. In two years, Monica Moran has been required to defend nine team recommendations not to arbitrate and has had two of those recommendations overturned by the Appeals Committee. *Moran dep.*, p. 17. It cannot be argued, therefore, that the Union's grievance process is "hollow" or a mere formality to uphold a foregone conclusion.

Likewise, Plaintiff has not shown that the Union made a bad faith decision not to arbitrate her grievance. "[B]ad faith is required to show breach of the duty [of fair representation] where the union has made a decision that the employee's grievance [is] without merit." *Armstrong*, 972 F. Supp. at 1089. Here, the Union simply determined that Plaintiff's grievance lacked merit and could not be won at arbitration. Nothing in the record indicates the Union acted in bad faith in making this determination, nor has Plaintiff introduced any evidence to contradict the Union's determination.

According to the Union, the primary factor behind its decision not to pursue arbitration was the Union's concern with the fact that a short-term employee, with a history of job performance issues, walked off the job (i.e., resorted to "self-help"). *Moran dep.*, p. 18. A Union does not breach its duty of fair representation when, in the face of such behavior, it declines to carry a grievance through the expense of arbitration. In *Whitten*, *supra*, the plaintiff claimed that his Union's refusal to obtain an arbitration hearing was a breach of its duty of fair representation. *Whitten*, 521 F.2d at 1337. In that case, the plaintiff (a truck driver with 13 years seniority) was discharged after the automobile-carrying truck he was driving hit a bridge that was too low for the height of the truck's load, and damaged two of the cars plaintiff was hauling. The plaintiff mailed a grievance to his Union, and the Union met with the employer to discuss the matter. The employer refused to rehire the plaintiff because of his involvement in a major accident, and the Union's attorney advised the Union's agents that the plaintiff's

13

discharge was lawful under the contract. Based on this, the Union concluded the plaintiff's grievance was meritless and declined to pursue arbitration. *Id.* at 1340.

The Sixth Circuit found that a Union does not have to process a grievance that it deems lacks merit, as long as it makes that determination in good faith. *Id.* at 1341. The plaintiff in *Whitten* asserted that "personal hostility" had been established by his proof that the Union failed to notify him of the Union's meeting with his employer, and failed to respond to his letters concerning the status of his grievance. The Sixth Circuit found, however, that the record evidence indicated the decision not to arbitrate was based upon the Union's good faith belief that the grievance was meritless, and not any personal animosity on the part of the Union.

The plaintiff in *Whitten* further contended that the Union's failure to advise him of the status of his grievance was "contrary to normal practice" (purportedly in an attempt to show that the Union's decision-making process was arbitrary). While the Sixth Circuit agreed the Union may have acted negligently or exercised poor judgment in failing to keep the plaintiff informed, it held that negligence and poor judgment were insufficient to support a claim of unfair representation. This is especially true where there is no evidence that a plaintiff's grievance was processed differently than others:

> [W]e have found no evidence in the record to suggest that Whitten's grievance was processed by the Union differently than grievances of other Union members.
> * * *
> A section 301 remedy against the Union, under *Vaca v. Sipes*, *supra*, is premised upon proof of "the Union's wrongful refusal to process the grievance." We conceive that wrongful refusal to process a grievance is properly judged in the light of the Union's undoubted obligation, as the statutory and contractual agent of the employee, to represent his interests honestly and in good faith, and thus to refrain from discriminatory conduct ... The allegation that there may have existed hostility between Whitten and the Union no doubt compels the trial court and us to examine the record with particular care to insure that the Union's refusal to process the grievance was not wrongful. However, absent evidence

14

> that the refusal to arbitrate the grievance was motivated by ill will toward Whitten, it is clear under *Vaca v. Sipes*, *supra*, that the Union was not compelled to arbitrate a grievance which, under any standard, was without merit.
>
> * * *
>
> *Vaca v. Sipes* ... recognizes the Union's right to preserve its own integrity in good faith representation of its members by freeing it from an obligation to pursue meritless claims. To have required the Union to have progressed further on penalty of risking an adverse jury verdict would go altogether against the spirit of *Vaca*.

*Whitten*, 521 F.2d at 1341 (internal citations omitted).[5]

Here, the record is undisputed that the Union conducted an investigation, offered an appeals process, allowed Plaintiff additional concessions during her hearing, and had rational grounds for not proceeding with Plaintiff's case. That Plaintiff is unhappy with the end result, and believes the Union should have argued *for* arbitration rather than *against*, does not - in and of itself - establish that the

---

[5] The Sixth Circuit has, very recently, issued a decision that is consistent with the law cited - and analysis undertaken - in this Opinion. In *White v. Detroit Edison Co.*, 2006 WL 3770779 (6th Cir., Dec. 22, 2006), the Sixth Circuit reviewed an appeal from a union employee who had been terminated after he engaged in inappropriate behavior shortly after returning to work from a "decision-making leave" he had been placed on for previous absences from work. As in Plaintiff's case here, the Union declined to arbitrate White's grievance. Prior to making that decision, however, the Union afforded Plaintiff a three-step grievance process that included an (unsuccessful) appeals hearing. The Union's decision not to arbitrate was based, in part, upon - as here - White's short tenure of employment and his history of work disturbances. The District Court granted summary judgment in favor of the Union, noting that the Union did not "rubber stamp" White's grievance and, in fact, solicited information from all sources - including White - that would be helpful in considering the grievance. The District Court found, therefore, that there was no indication the Union acted arbitrarily or in bad faith. The Sixth Circuit affirmed, noting that although two members of the Union's executive board felt that White's grievance was worthy of arbitration, the majority felt otherwise - and for rational reasons. The court concluded there simply was no evidence that the majority of the board "arbitrarily ignored" the grievance, or handled it "in a perfunctory manner;" therefore, White's breach of the duty of fair representation claim failed. The Sixth Circuit's rationale in *White* applies equally here.

15

Union did not fairly represent Plaintiff, or that the Union's ultimate decision was made in bad faith. Nor would an examination of the underlying merits of Plaintiff's grievance assist Plaintiff. This is because, even if Plaintiff offered proof that her grievance was meritorious, "a breach of the duty of fair representation is not established merely by proof that the underlying grievance was meritorious." *Vaca*, 386 U.S. at 195.

Rather than spend valuable resources defending a grievance it believed lacked merit, the Union chose not to pursue it further. Plaintiff was granted an opportunity to appeal this decision, which she pursued unsuccessfully. The Union analyzed the issues, and made a reasoned decision not to arbitrate her grievance.[6] As a matter of law, that is adequate representation which - by definition - bars Plaintiff's Section 301 claim against the Union. Further, because Plaintiff must prevail against **both** the Union and Murtis to sustain her Section 301 claims, her entire action under Section 301 fails as a matter of law.

---

[6] Indeed, as Monica Moran testified, the Union reviewed Plaintiff's entire personnel file prior to the meeting with Murtis, spoke with Plaintiff prior to that meeting in order to obtain Plaintiff's version of events, defended Plaintiff at the meeting, and convened a team of three Union representatives to review all the evidence prior to sending the file to Columbus for further review. *Moran dep.*, pp. 10-14.

### IV.     CONCLUSION

For all of these reasons, the Court concludes Plaintiff is unable to raise a question of material fact with respect to whether the Union breached its duty of fair representation.  The Union, therefore, is entitled to judgment as a matter of law on the only surviving count - Count I - in Plaintiff's Complaint.  The Court finds, moreover, that there is no longer a legal basis for Plaintiff's Section 301 claim against Murtis under the doctrines applicable to hybrid Section 301 claims.

Accordingly, it is

ORDERED THAT the Motion for Summary Judgment filed by the Union (Doc. 22-1) is **GRANTED** and this case is hereby **DISMISSED** in its entirety.

**IT IS SO ORDERED.**

s/Kathleen M. O'Malley<br>
**KATHLEEN McDONALD O'MALLEY**<br>
**UNITED STATES DISTRICT JUDGE**

**Dated: January 8, 2007**